Argued and submitted June 28, reversed; referee's order
reinstated September 29, reconsideration denied November 23, 1982,
petition for review allowed February 8, 1983 (294 Or 491)

In the Matter of the Compensation
of Henry McGarrah, Claimant.

McGARRAH,
*Petitioner,*

*v.*

STATE ACCIDENT INSURANCE FUND
CORPORATION,
*Respondent.*

(79-05440; CA A22990)

651 P2d 153

Robert H. Grant, Medford, argued the cause for peti-
tioner. With him on the brief was Grant, Ferguson &
Carter, Medford.

Darrell E. Bewley, Appellate Counsel, State Accident Insurance Fund Corporation, Salem, argued the cause and filed the brief for respondent.

Evohl F. Malagon, Eugene, filed the brief amicus curiae for Oregon Workers' Compensation Attorneys Association.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Claimant appeals from a determination by the Workers' Compensation Board (Board) that his psychiatric disability is not compensable. This case is the first to reach us of a series decided after *James v. SAIF*, 290 Or 343, 624 P2d 565 (1981), in which the Board has attempted to adapt an exception to compensability for physical injuries, where there has been a deviation from work duties, to cases involving adverse psychological reaction to supervision. The principal question on appeal is whether claimant's condition arises out of and in the scope of his employment within the meaning of ORS 656.802(1)(a).[1]

Claimant, 40 years old at the time of the hearing, was a deputy sheriff in Jackson County from the fall of 1975 through December 4, 1978. He had worked previously as a deputy from 1969 to 1973, when his back was injured in a job-related automobile accident. After a period of recuperation, he was rehired in 1975. Sometime thereafter, claimant wrote a memorandum to his superiors requesting an investigation into the low morale within the department and apparently suggesting that a certain officer known as "B.J." not participate in the investigation. Subsequently, B.J. became a captain and claimant's superior.

A series of events ensued that convinced claimant that he was being subjected to a personal vendetta by Captain B.J. to encourage him to resign or quit. Those events included the removal of claimant one month early from a public relations job, which he enjoyed, in order to transfer him back to patrol, where it appeared to claimant and to a chief deputy that he was not really needed; his transfer from the day shift to the night shift (which claimant considered a rookie shift), despite his high seniority in the department; failure to promote him to senior deputy status, despite his seniority and his achievement of advanced officer status, when others eligible at that time

---

[1] ORS 656.802(1)(a) provides:

"(1) As used in ORS 656.802 to 656.824, 'occupational disease' means:

"(a) Any disease or infection which arises out of and in the scope of the employment, and to which an employe is not ordinarily subjected or exposed other than during a period of regular actual employment therein."

for the promotion were granted it; frequent oral reprimands in the presence of others by the captain or his subordinates about claimant's appearance, which claimant felt was satisfactory; reprimands for not writing enough traffic tickets; oral reprimands in public for having left his post without authorization when his son was injured at school, although claimant had unsuccessfully attempted to reach his supervisor; a reprimand for abandoning his vehicle, which was stuck in a snowdrift in an area where radio communications were blacked out; and a memorandum inquiring into the possibility that claimant had allowed narcotics to go aboard an airplane while he was supervising security personnel at the airport, although no investigation was ever conducted to permit claimant to exonerate himself. The reprimands, standing alone, were not as upsetting to claimant as was the fact that they were usually made in the presence of others.

Claimant did not initiate a union grievance concerning any of the above incidents, although he did write a letter invoking the union contract in response to his early transfer back to patrol. By the same token, the reprimands were unofficial disciplinary actions. That Captain B.J. was the source of low morale in the department was corroborated at the hearing by a former colleague of claimant. Another former officer confirmed that Captain B.J. exhibited a pattern of putting pressure on individual officers through manipulation of shift scheduling and excessive criticism of the quantity and quality of the individuals' work. These pressures evidently reached a critical point for claimant on the day he learned of his shift change. He went home in a state of acute depression with violent feelings of hostility about Captain B.J. That condition persisted for some time. Claimant did not return to work as a deputy sheriff. Eventually, he turned to selling real estate, which he had done earlier in his career.

A psychiatrist testified at the hearing that claimant suffered from anxiety and depressive neurosis directly related to his job as deputy sheriff, as a result of the perceived vendetta and the natural stresses of the job. No psychiatrist consulted found otherwise, and there was no evidence of stress outside the job that was a contributing cause of claimant's condition.

The referee- found that claimant had proved a compensable occupational disease. The Board, although it adopted the referee's factual description of claimant's condition,[2] reversed the referee and ruled that claimant's condition was not compensable. The key portion of the Board's opinion states:

"* * * An adverse psychological reaction to normal and reasonable supervision is not within the scope of employment when the precipitating event (supervision) occurred because the employee was not functioning within the scope of employment. First, it seems illogical to say that the physical results of an injury-producing activity are not compensable when the injury-producing activity is beyond the scope of employment, but to also say that the psychological results of supervision intended to end that deviation are compensable. Second, assuming supervision to keep employees functioning within the scope of their employment is inevitable in the employment relationship,

---

[2] The Board adopted the following portion of the referee's opinion, which contains not only description but legal conclusions:

"The evidence does not support, objectively, many of the claimant's contentions. Captain [B.J.] testified credibly that the Department was equipped with avenues to correct improper behavior by officers and to allow them to express their grievances and that these avenues alone were used for disciplinary measures and for the evaluation of complaints by employees. I do not understand the law here to require that the claimant's perception of a vendetta against him be accurate. It requires that the claimant's mental difficulty can be traced to objective stimuli on the job. It is a fact that the claimant was removed from his public relations job. It is a fact that he was changed from day shift to night shift. It is a fact that he was reprimanded on various occasions for not writing traffic tickets or for not having proper appearance in uniform. It is a fact that he tried for professional advancement and was repeatedly turned down. It is probably a fact that the claimant's perception of what he should be, as a professional law enforcement officer, differed somewhat markedly from the notion held by his superiors and that friction repeated itself due to this problem. It is probably a fact that at times the claimant's performance fell down. At least one of his superiors testified that the claimant tended to fail to respond to calls on occasion and did not pay enough attention to traffic enforcement.

"Given all of these facts a different individual, even a somewhat sensitive individual, might not have responded with the gradual emotional buildup the claimant suffered. For the claim to be compensable it is not, in my understanding, required that stress on the job be illegitimate. There are many jobs which legitimately are stressful on a day-to-day basis. Responding to identifiable and objective verifiable stimuli, the claimant suffered a mental disease from his job experience, an experience which was stressful to him for circumstances to which he was not subjected other than at work during the course of the development of his difficulty."

then it is nothing more than the existence of the employment relationship itself that produces a finding of compensability if this supervision supplies the only nexus that makes resulting psychological problems compensable. Just as the employer must take the employee as he is, the employee must to a large extent take the job as it is."

It appears to us that there are serious analytical problems with the Board's test and its application in this case. The Board characterized the origin of this claimant's stress as "conflict between the way [claimant] wanted to do his job * * * and the way his supervisors wanted the job done * * *." Although elements of such a conflict did exist, we find it difficult to understand how failing to measure up to a desired standard would constitute functioning *outside* the scope of employment. That concept is crucial to the rationale of the Board's rule, yet it is not amplified or defined in the Board's opinion. The Board states simply that the rule applies when the "precipitating event (supervision) occurred because the employe was not functioning within the scope of employment." As applied, the rule seems to stand for the proposition that *any* shortcoming in an employe's job performance means the employe is functioning outside the scope of employment. The proposition is far broader than the analogous proposition culled by the Board from cases involving physical injury, where deviation from employment duties, such as engaging in prohibited activities, is beyond the scope of employment.[3]

---

[3] The Board's opinion states in relevant part:

"It is a familiar doctrine in workers' compensation that an injury that happens when an employee is acting beyond the scope of employment is not compensable. *Clark v. U.S. Plywood,* 288 Or 255 [266-67, 605 P2d 265 (1980)]; *Lane v. Gleaves Volkswagen,* 39 Or App 5 [7, 591 P2d 368, 40 Or App 139, 594 P2d 1249 (1979)]; *Frosty v. SAIF,* 24 Or App 851 [853-54, 547 P2d 634, *rev den* (1976)]. Sometimes these cases find a worker is beyond the scope of employment because of deviation from employment duties. *O'Connell v. SAIF,* 19 Or App [735, 528 P2d 1064 (1974)]. Certain forms of horseplay have been found to be a deviation from work duties. *Hackney v. Tillamook Growers,* 39 Or App 655 [659, 593 P2d 1195, *rev den* 286 Or 449 (1979)]. In all of these situations, one of the significant tests used to determine whether the employee was within or beyond the scope of employment is whether the injury-producing activity was contemplated by the employer and employee either at the time of hiring or later. *Ramseth v. Maycock,* 209 Or 66, [76, 304 P2d 415 (1956)]; *Etchison v. SAIF,* 8 Or App 395 [399, 494 P2d 455 (1972) (citing *Ramseth v. Maycock, supra)].* "The law intends. . . to protect [the employe] against the risk or hazard taken in order to perform the master's task." *Brady v. Oregon*

The physical injury cases cited by the Board predate the decision by the Supreme Court establishing a unitary work connection approach to compensability. *Rogers v. SAIF,* 289 Or 633, 616 P2d 485 (1980). In *Rogers,* a heart attack sustained after a scuffle in a bar between members of a crew working on location, but during off-hours, was considered to have sufficient work connection to be compensable. In this case, the Board cited *Rogers* without discussion, but in formulating its rule here it attempted to analogize such cases as *Frosty v. SAIF,* 24 Or App 851, 547 P2d 634, *rev den* (1976), where we held that injuries sustained by a charter bus driver while skiing were not compensable where the claimant had been specifically instructed not to ski during ski charters.

As quoted above, the Board found it illogical to deny compensability under such circumstances for a physical injury but to allow it for a psychological condition. The two situations, however, are not comparable, because claimant's condition here was the direct result of supervision of his work within the scope of his employment, not relating to activity that was not a part of his job. At most, claimant was not doing all that was within the scope of his employment, or was not doing it as well as his supervisor desired. A better test of the Board's rule, on its face, might be presented if the claimant in *Frosty* had suffered a psychological disability as a direct result of his supervisor having castigated him severely for having skied while on a charter run, contrary to express instructions, even though he performed well the job for which he was hired. That question, however, is not presented here, and we do not decide it.[4]

---

*Lumber Co.,* 117 Or [188, 197, 243 P 96, *reh den* 118 Or 15, 245 P 732 (1926)]. Compensability depends upon whether the worker was injured 'doing the duty which he is employed to perform.' *Stuhr v. SIAC,* 186 Or 629 [636, 208 P2d 450 (1949)]."

[4] It is also possible that an adverse psychological reaction may result directly from unauthorized activity outside the scope of employment, rather than from supervision concerning that activity. A fanciful example would be that of a zoo employe assigned exclusively to duty at an aviary but who, despite clear instructions to the contrary, found himself repeatedly drawn, with a kind of morbid fascination, to the snake house, as a result of which his long-standing fear of snakes gradually developed into a psychosis. That example illustrates the direct

■ In reasoning that supervision may not provide the only nexus that makes psychological problems compensable, the Board appears to have concluded that the scope of employment concept includes the quality of performance, falling short of which puts the activity and the related supervisory control outside the scope of that employment. We know of no authority for such a proposition, and it is contrary to the workers' compensation scheme, under which fault is not a consideration in determining compensability. *See* ORS 656.012(2)(a)[5]; *Clark v. U.S. Plywood,* 288 Or 255, 265, 605 P2d 265 (1980).[6] So, too, is the Board's statement: "Just as the employer must take the employee as he is, the employee must to a large extent take the job as it is."[7]

Assuming the validity of the general proposition stated by the Board that claimant's adverse reaction to reasonable and normal supervision is outside the scope of employment where the supervision was precipitated by the

analogue, in the realm of psychological conditions, of the "deviation from work duties" exception to compensability for physical injuries. Under a correct expression of that principle, therefore, a psychological condition that arises directly out of activities outside the scope of employment would not be compensable. But that is not the rule advanced by the Board.

[5] ORS 656.012(2)(a) provides:

"(2) In consequence of these findings, the objectives of the Workers' Compensation Law are declared to be as follows:

"(a) To provide, regardless of fault, sure, prompt and complete medical treatment for injured workers and fair, adequate and reasonable income benefits to injured workers and their dependents."

[6] *See also* Prosser, Torts 531, § 80 (4th ed 1971):

"Workmen's compensation is * * * a form of strict liability: The employer is charged with the injuries arising out of his business, without regard to any question of his negligence, or that of the injured employee. He is liable for injuries caused by pure unavoidable accident, or by the negligence of the workman himself. The three wicked sisters of the common law—contributory negligence, assumption of risk and the fellow servant rule—are abolished as defense. The only questions remaining to be litigated are, first, were the workman and his injury within the act, and second what shall be the compensation paid."

[7] Certainly, an employe may be required to meet minimum job expectations. Under our analysis, however, if the employe is unable to handle the physical or mental demands of the job and succumbs to its pressures, resulting in either physical or mental illness or injury, then a compensable condition has arisen out of the employment if the requirements of *James v. SAIF, supra,* are met.

employe's acting outside the scope of his employment, it is not applicable here. Where an employe deviates from expected performance standards, supervision directed at improving job performance, by definition, falls within the scope of employment. Such supervision, as the Board itself recognized, is "inevitable in the employment relationship." In other words, if that kind of supervision is the nexus linking the psychiatric condition to the job, the claim arises out of and in the course of employment within the meaning of ORS 656.802(1)(a).

We turn to SAIF's arguments in support of the Board's order. SAIF first contends that because the series of reprimands was not within claimant's and the employer's contemplation of job tasks, claimant's mental problems were not a risk within the scope of employment. However, the job *tasks* were within those assigned to him; the problem related to claimant's performance of those tasks. We have already said that an adverse psychological reaction to supervision directed at improving job performance is within the scope of employment. Because such supervision is part of the work relationship, a reaction to it must be deemed a risk of employment.

SAIF also contends that it was claimant's own deviation that instigated the reprimands and that, if claimant had done his job adequately, he would not have suffered the psychological disabilities of which he now complains. Carried to its logical conclusion, that line of reasoning would reintroduce fault into the workers' compensation system, contrary to the express policy of the Workers' Compensation Law. Accordingly, we reject it.

Finally SAIF argues that, because claimant's perception of being singled out or discriminated against unfairly was unfounded, legal causation of his psychological difficulties is lacking. We note that colleagues of claimant corroborated the existence of a pattern of conduct in the sheriff's department involving selective job pressure directed at some individuals, including claimant, and that the captain was the source of low morale in the department. As the referee observed, *supra* n 2, it is unnecessary that claimant prove that his stress resulted from harassment or other illegitimate supervision. That, too, would inject the element of fault into the proceeding.

Neither is the claim precluded because the incidents contributing to claimant's stress might not have adversely affected an *average* worker. We explicitly rejected that idea in our opinion in *James v. SAIF,* 44 Or App 405, 411, 605 P2d 1368 (1980). Nothing said by the Supreme Court in its opinion remanding the case to us, *see James v. SAIF,* 290 Or 343, 624 P2d 565 (1981), is inconsistent with what we said, and we reiterate it:

> "* * * Courts may feel more secure in being able to point to job conditions that would cause mental disability in the average person; however, the price of this requirement would be denial of claims of persons who are, in fact, disabled because of conditions of employment. There is no logical basis for distinguishing between physical and emotional disability. When the ordinary stress of employment causes a physical disability, the requirements of the law are met. This rule should not be made more strict simply because the result is a mental disability." 44 Or App at 411.

■  In this case it is clear that claimant believed he was being harassed by a superior. It is also clear that the events about which claimant complains did, in fact, occur, although it is difficult to know whether they were intended to harass, as claimant perceived them. We can imagine a case in which an acute paranoid state is triggered by job stresses and, as a result, the employe finds evidence of a conspiracy against him in the most innocent events occurring on the job. If the job stresses were "the major contributing cause" of the paranoia, *see SAIF v. Gygi,* 55 Or App 570, 574, 639 P2d 655, *rev den* 292 Or 825 (1982), it would be irrelevant for purposes of compensability whether or not claimant's perception of events that, in fact, occurred was well founded. If claimant's perception were well founded, it would be debatable whether there was in fact a mental illness.

In *James,* the Supreme Court implicitly accepted the notion that criticism by a supervisor can be a contributing cause of compensable mental illness. 290 Or at 351. We conclude that claimant was not required to make out a case of intentional harassment in order to show that work supervision was the legal cause of the appearance or worsening of a mental condition. He need only show, as he did,

that supervisory action and criticism relating to his performance on the job, to which he was not ordinarily subjected or exposed other than during a period of regular employment, was the major source of stress triggering his psychological disability.

The Board's approach in this case evidences a legitimate concern for the need to confine psychological disability claims under the workers' compensation law to those that are legitimately work connected. We believe, however, that the limitation on liability attempted by the Board here does not comport with the statutory scheme. In that scheme, there is no distinction among occupational diseases or between physical and mental or psychological disability. *See* ORS 656.802 *et seq.* It does, however, contain a limiting test emphasized in the Supreme Court's opinion in *James v. SAIF, supra,* and articulated by this court in *SAIF v. Gygi, supra:* on-the-job stress must be the *major* contributing cause of an occupational disease. That standard is not at issue here. Neither SAIF nor the Board has taken the position that job-related stress was not the major contributing factor. Both the medical and other evidence establish that job-related stress caused claimant's mental disorder.

The only questions we decide here are whether claimant's depressive condition can be said to have arisen out of and within the scope of his employment within the meaning of ORS 656.802(1)(a), and whether claimant must prove that he was being harassed or discriminated against on the job to show legal causation of his disorder. In holding that claimant's disease did arise out of his employment, we reject the applicability of the rule articulated by the Board to this case. We also hold that claimant was not required to prove harassment or unfair discrimination to make out a claim for his psychological disorder resulting from the stressful effect of his supervision.

Reversed; the referee's order reinstated.